# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEVIN FELDMAN, Individually and on Behalf of All Others Similarly Situated, | ) CIVIL ACTION NO. |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) 13 CV 5123 |
| | ) |
| vs. | ) |
| | ) |
| LINNCO, INC., MARK E. ELLIS, KOLJA | ) CLASS ACTION |
| ROCKOV, DAVID B. ROTTINO, GEORGE A. | ) |
| ALCORN, DAVID D. DUNLAP, TERRENCE S. | ) |
| JACOBS, MICHAEL C. LINN, JOSEPH P. | ) |
| MCCOY, JEFFREY C. SWOVELAND, | ) |
| BARCLAYS CAPITAL INC., CITIGROUP | ) |
| GLOBAL MARKETS INC., RBC CAPITAL | ) |
| MARKETS, LLC, WELLS FARGO SECURITIES, | ) JURY TRIAL DEMANDED |
| LLC,  MERRILL LYNCH, PIERCE, FENNER & | ) |
| SMITH INCORPORATED, CREDIT SUISSE | ) |
| SECURITIES (USA) LLC, RAYMOND JAMES & | ) |
| ASSOCIATES, INC., UBS SECURITIES LLC, | ) |
| GOLDMAN, SACHS & CO., J.P. MORGAN | ) |
| SECURITIES LLC, ROBERT W. BAIRD & CO., | ) |
| INCORPORATED, BMO CAPITAL MARKETS | ) CLASS ACTION COMPLAINT |
| CORP., CREDIT AGRICOLE SECURITIES | ) FOR VIOLATION OF THE |
| (USA) INC., CIBC WORLD MARKETS CORP., | ) FEDERAL SECURITIES LAWS |
| HOWARD WEIL INCORPORATED, AND | ) |
| MITSUBISHI UFJ SECURITIES (USA) INC., | ) |
| | ) |
| Defendants. | ) |

By and through his undersigned counsel, Plaintiff Kevin Feldman ("Plaintiff") alleges the

following against LinnCo, LLC ("LNCO", "LinnCo" or the "Company"), certain of the

Company's officers and directors and certain other entities that facilitated the Company's

October 12, 2012 initial public offering (the "IPO" or the "Stock Offering").  Plaintiff makes

these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to

all other matters, upon the investigation of counsel, which included, without limitation:  (a)

review and analysis of public filings made by LNCO with the Securities and Exchange

Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants and other related non-parties; (c) review of news articles, shareholder communications, conference call transcripts and postings on LNCO's website concerning the Company's public statements; and (d) review of other publicly available information concerning LNCO, the other Defendants and related non-parties.

I.   **NATURE OF THE ACTION**

1.      This is a federal securities class action against LNCO and certain of its officers and/or directors, and the underwriters for violations of the federal securities laws.  Plaintiff brings this action on behalf of all persons or entities who purchased or otherwise acquired shares pursuant or traceable to LNCO's Stock Offering through July 1, 2013, inclusive (the "Class Period"), seeking to pursue remedies under §§11 and 15 of the Securities Act of 1933 (the "Securities Act").  Under the Securities Act, Defendants are strictly liable for the material misstatements in the Registration Statement and the Prospectus (collectively, the "Offering Documents") for this public stock offering, and these claims specifically exclude any allegations of knowledge or scienter.  The Securities Act claims also expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

2.      LNCO is a limited liability company created to enhance LINN Energy's ("LINN") ability to raise additional equity capital to execute on its acquisition and growth strategy.  LINN is a United States independent oil and natural gas partnership focusing on the development and acquisition of long-life properties that complement its asset profile in producing basins within the United States.  LNCO does not engage in its own operations and has no assets other than those related to LNCO's interest in LINN.  As such, LNCO's financial condition and results of operations depend entirely upon the performance of LINN.  LNCO's

ability to pay dividends to its shareholders is dependent upon the ability of LINN to make distributions to its unitholders.

3.      On October 12, 2012, LNCO filed its Prospectus for its IPO of common shares. The Prospectus forms part of the Registration Statement that became effective October 11, 2012. 30,250,000 common shares were offered in the Stock Offering, with an additional 4,537,500 shares granted to the Underwriters through an option for a period of 30 days to purchase on the same terms and conditions.  The price to the public per share was $36.50.  LNCO stated in the Prospectus that the Company would use the net proceeds from the Stock Offering to acquire a number of units representing limited liability company interests ("units") in LINN equal to the number of shares sold in the Stock Offering.

4.      On February 16, 2013, *Barron's* published an article stating that "Linn may be overstating the cash flow available for distribution, by not deducting the cost of financial derivatives—mainly put options—from its realized gains on hedging activities in its quarterly results."  The article concluded that investors should "steer clear" of Linn and "start asking harder questions about what Linn calls its 'industry-leading hedge program.'"

5.      On February 21, 2013, LINN and LNCO announced their financial and operating results for the fourth quarter and the year-ended December 31, 2012, as well as the outlook for 2013.  In addition, LINN and LNCO announced the signing of a definitive merger agreement to acquire all of Berry Petroleum Company's ("Berry") outstanding shares for $4.3 billion, including the assumption of debt.  LNCO agreed to issue 1.25 common shares for each common share of Berry outstanding prior to the merger.

6.      On May 4, 2013, *Barron's* published an article, entitled "Twilight of a Stock-Market Darling" stating that LINN "may be the country's most overpriced large energy

producer" and LINN "has for years used aggressive accounting to prettify its financial statements." As a result of the article, LINN units declined 7%, from $38.44 the previous trading session to close at $35.75 per unit on May 6, 2013. In turn, LNCO shares dropped approximately 8%, from $42.56 the previous trading session to close at $39.24 per share on May 6, 2013.

7.      On July 1, 2013, LINN and LNCO announced an informal Securities and Exchange Commission ("SEC") inquiry regarding LINN and LNCO. The SEC "requested the preservation of documents and communications that are potentially relevant to, among other things, LinnCo's proposed merger with Berry Petroleum Company, and LINN and LinnCo's use of non-GAAP financial measures and hedging strategy."

8.      On the news of the SEC inquiry, LNCO shares plummeted from a closing of $37.07 per share on July 1, 2013 to a closing of $26.95 per share on July 3, 2013, for a sharp decrease of approximately 27%.

9.      This Complaint alleges that, in LNCO's Offering Documents and throughout the Class Period, Defendants failed to disclose material adverse facts about the Company's and LINN's financial well-being and prospects. As a result of Defendants' wrongful actions, false and misleading statements and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the other Class members have suffered significant losses and damages.

10.     In the allegations and claims set forth in this Complaint, Plaintiff asserts a series of strict liability and negligence claims based on the Securities Act on behalf of the Class. Plaintiff's Securities Act claims are not based on any allegations of knowing or reckless misconduct on behalf of the Defendants named in the Securities Act claims. Plaintiff's claims do

not allege, and do not sound in, fraud, and Plaintiff specifically disclaims any reference to or reliance upon allegations of fraud in these non-fraud claims under the Securities Act.

## II.   <u>JURISDICTION AND VENUE</u>

11.    The claims asserted herein arise under and pursuant to §§11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o.

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and Section 22 of the Securities Act (15 U.S.C. §77v).

13.    Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act and 28 U.S.C. §1391(b).  Many of the acts and transactions alleged herein occurred in substantial part in this Judicial District.  Additionally, many of the Underwriter Defendants maintain their executive offices and/or other offices within this Judicial District.  All Defendants conducted business in this District related to the IPO as LNCO trades on the NASDAQ exchange which is headquartered within this Judicial District at One Liberty Plaza 165 Broadway New York, New York 10006.  Defendants have received substantial compensation in this Judicial District by doing business here and engaging in numerous activities that had an effect in this Judicial District.

14.    In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of a national securities exchange.

III.    **PARTIES**

     A.    **Plaintiff**

     15.    Plaintiff Kevin Feldman, as set forth in the accompanying certification and incorporated by reference herein, purchased the publicly-traded securities of LNCO pursuant to the Company's IPO at artificially inflated prices during the Class Period and has been damaged thereby.

     B.    **Defendants**

     16.    The following claims are asserted pursuant to the materially untrue statements contained in and incorporated in the Offering Documents, against all signatories to the Offering Documents, all members of the Company's Board of Directors at the time of the filing of the materially untrue Offering Documents, the banks that underwrote the Stock Offering (defined below as the "Underwriter Defendants"), and those officers who were controlling persons of LNCO.  Each of these Defendants is statutorily liable under Sections 11 and/or 15 of the Securities Act for the materially untrue statements contained in and incorporated in LNCO's Offering Documents.

     i.    **The Company**

     17.    Defendant LNCO is a Delaware limited liability company (LLC) formed on April 30, 2012, under the Delaware Limited Liability Company Act.  LNCO's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "LNCO."  The Company's principal executive offices are located at 600 Travis, Suite 5100, Houston, Texas 77002.

ii.    **The Officer Defendants**

18.    Defendant Mark E. Ellis serves as the Company's Chief Executive Officer ("CEO"), President and Chairman. Ellis signed or authorized the signing of the false and misleading Registration Statement.

19.    Defendant Kolja Rockov ("Rockov") is the Executive Vice President and Chief Financial Officer ("CFO") of LNCO. Defendant Rockov signed or authorized the signing of the false and misleading Registration Statement.

20.    Defendant David B. Rottino ("Rottino") serves as Chief Accounting Officer and Senior Vice President at LNCO.  Defendant Rottino signed or authorized the signing of the false and misleading Registration Statement.

21.    Defendants Ellis, Rockov and Rottino are collectively referred to herein as the "Officer Defendants."

iii.    **The Director Defendants**

22.    Defendant George A. Alcorn ("Alcorn") serves as Director of LNCO.  Defendant Alcorn signed or authorized the signing of the false and misleading Registration Statement.

23.    Defendant David D. Dunlap ("Dunlap") served as Director of LNCO until his resignation from the board of directors on February 19, 2013 to form the LINN Conflicts Committee in connection with the proposed merger with Berry.  Defendant Dunlap signed or authorized the signing of the false and misleading Registration Statement.

24.    Defendant Terrence S. Jacobs ("Jacobs") serves as a director of LNCO. Defendant Jacobs signed or authorized the signing of the false and misleading Registration Statement.

25.     Defendant Michael C. Linn ("Linn") serves as a director of LNCO.  Defendant Linn signed or authorized the signing of the false and misleading Registration Statement.

26.     Defendant Joseph P. McCoy ("McCoy") serves as a director of LNCO. Defendant McCoy signed or authorized the signing of the false and misleading Registration Statement.

27.     Defendant Jeffrey C. Swoveland ("Swoveland") serves as a director of LNCO until his resignation from the board of directors on February 19, 2013 to form the LINN Conflicts Committee in connection with the proposed merger with Berry.  Defendant Swoveland signed or authorized the signing of the false and misleading Registration Statement.

28.     Defendants Alcorn, Dunlap, Jacobs, Linn, McCoy and Swoveland are collectively referred to herein as the "Officer Defendants."

### iv.    The Underwriter Defendants

29.     Defendant Barclays Capital Inc. ("Barclays") acted as a representative of the underwriters and as joint book-running manager for LNCO's IPO, helping to draft and disseminate the Offering Documents.  Barclays, on behalf of the underwriters, delivered the shares.  Barclays maintains headquarters in this District at 200 Park Avenue, 4th Floor, New York, New York 10166.

30.     Defendant Citigroup Global Markets, Inc. ("Citigroup") acted as a representative of the underwriters and as joint book-running manager for LNCO's IPO, helping to draft and disseminate the Offering Documents.  Citigroup is headquartered in this District at 388 Greenwich Street, New York, New York 10006.

31.     Defendant RBC Capital Markets LLC ("RBC") acted as a representative of the underwriters and as joint book-running manager for LNCO's IPO, helping to draft and

disseminate the Offering Documents.  RBC conducts substantial business in this District from offices located at 1 Liberty Street New York, New York 10006.

32.     Defendant Wells Fargo Securities, LLC ("Wells Fargo") acted as a representative of the underwriters and as joint book-running managers for LNCO's IPO, helping to draft and disseminate the Offering Documents.  Wells Fargo conducts substantial business in this District from offices located at 375 Park Avenue, 10th Floor, New York, New York 10152.

33.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") acted as a representative of the underwriters and as joint book-running managers for LNCO's IPO, helping to draft and disseminate the Offering Documents.  Merrill Lynch is headquartered in this District at 4 World Financial Center, 250 Vesey Street, New York, New York 10080.

34.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") acted as a representative of the underwriters and as joint book-running manager for LNCO's IPO, helping to draft and disseminate the Offering Documents.  Credit Suisse is headquartered at 11 Madison Avenue, New York, New York 10010.

35.     Defendant Raymond James & Associates, Inc. ("RJA") acted as an underwriter for LNCO's IPO, helping to draft and disseminate the Offering Documents.  RJA conducts substantial business in this District from offices located at 277 Park Avenue, Suite 410, New York, New York 10172.

36.     Defendant UBS Securities LLC ("UBS") acted as an underwriter for LNCO's IPO, helping to draft and disseminate the Offering Documents.  UBS conducts substantial business in this District from offices located at 1285 Avenue of the Americas, New York, New York 10019.

37.     Defendant Goldman, Sachs & Co. ("Goldman") acted as an underwriter for LNCO's IPO, helping to draft and disseminate the Offering Documents.   Goldman is headquartered in this District at 200 West Street #200, New York, New York 10282.

38.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") acted as an underwriter for LNCO's IPO, helping to draft and disseminate the Offering Documents.  J.P. Morgan is headquartered in this District at 383 Madison Avenue, New York, New York 10179.

39.     Defendant Robert W. Baird & Co. Incorporated ("Baird") acted as an underwriter for LNCO's IPO, helping to draft and disseminate the Offering Documents.  Baird conducts substantial business in this District from offices located at 3 Rockefeller Plaza, 610 Fifth Avenue #308, New York, New York 10112.

40.     Defendant BMO Capital Markets Corp. ("BMO") acted as an underwriter for LNCO's IPO, helping to draft and disseminate the Offering Documents.  BMO conducts substantial business in this District from offices located at 3 Times Square, New York, New York 10036.

41.     Defendant Credit Agricole Securities (USA) Inc. ("CAS") acted as an underwriter for LNCO's IPO, helping to draft and disseminate the Offering Documents.  CAS is headquartered in this District at 1301 Avenue of the Americas, New York, New York 10019.

42.     Defendant CIBC World Markets Corp. ("CIBC") acted as an underwriter for LNCO's IPO, helping to draft and disseminate the Offering Documents.  CIBC is headquartered in this District at 425 Lexington Avenue, New York, New York 10017.

43.     Defendant Howard Weil Incorporated ("Howard Weil") acted as an underwriter for LNCO's IPO, helping to draft and disseminate the Offering Documents.

44.     Defendant Mitsubishi UFJ Securities (USA), Inc. ("Mitsubishi") acted as an underwriter for LNCO's IPO, helping to draft and disseminate the Offering Documents. Mitsubishi is headquartered in this District at 1633 Broadway, 29th Floor, New York, New York 10019.

45.     The Defendants listed above are sometimes referred to as the "Underwriter Defendants."  The Company, the Officer and Director Defendants, and the Underwriter Defendants are collectively referred to as the "Defendants."

## IV.   SUBSTANTIVE ALLEGATIONS

### A.     Background of LNCO

46.     LNCO was formed on April 30, 2012 to enhance LINN's ability to raise additional equity capital to execute its acquisition and growth strategy.  LNCO's sole purpose is to own LINN units.

47.     LINN is an oil and natural gas development partnership, with approximately 4.8 Tcfe of proved reserves in producing United States basins as of December 31, 2012.  LINN's core focus areas are the Mid-Continent, Permian Basin, Hugoton Basin, Rockies, Michigan and California.

48.     LNCO is taxed as a corporation, which enables holders of LNCO shares to invest indirectly in LINN without the associated tax-related obligations of owning a LINN unit.  LINN as a partnership is taxed differently. Consequently, holders of LNCO shares will not have unrelated business taxable income (UBTI), and will not be required to file state income tax returns as a result of owning LNCO shares as opposed to LINN units.  LINN formed LNCO to appeal to investors desiring to invest in LINN but failing to do so due to the more onerous tax-reporting requirements.

49.     LNCO quarterly dividends are determined based on LINN's performance.  LNCO owns a number of LINN units equal to the number of LNCO shares outstanding and receives the same distribution per LINN unit as all other LINN unitholders. When LNCO receives a quarterly distribution from LINN, it reserves an amount equal to LNCO's estimated income tax liability, and then distributes the balance as a dividend to LNCO shareholders.

50.     LNCO and LINN are clearly intertwined.  LNCO submits to a vote of its shareholders any matter submitted by LINN to a vote of its unitholders, including the annual election of the LINN board of directors.  LNCO votes the LINN units it holds in the same manner as its shareholders vote on those matters.  Although, LNCO shareholders are entitled to vote on certain fundamental matters affecting LNCO, they do not have the right to elect the LNCO board of directors.  LINN holds the sole voting share in LNCO; as such LINN is in charge of electing the LNCO board.  LNCO's board of directors was composed of the same members as LINN's board of directors until the recent pending merger with Berry.  LNCO's principal executive offices are at the same address as that of LINN's.

51.     LNCO states that its sole asset is LINN units.  Therefore, the stability of LNCO is dependent on the success of LINN.  All of LNCO's quarterly and annual financial reports since the Stock Offering have included LINN's quarterly and annual financial reports as an exhibit – with the exhibits incorporated by reference into the respective LNCO report.

**B.      The Material Misstatements and Omissions Made in Connection with the IPO in the Offering Documents**

52.     On October 2, 2012, LINN publicly announced the launching of the LNCO Initial Public Offering.  The press release stated in relevant part:

LINN Energy, LLC (Nasdaq:LINE) ("LINN") announced today that LinnCo, LLC (Nasdaq:LNCO) ("LinnCo"), a wholly-owned subsidiary of LINN, has **commenced an initial public offering of 30,250,000 common shares representing limited liability company interests in LinnCo pursuant to a**

11

*registration statement on Form S-1 previously filed with the U.S. Securities and Exchange Commission ("SEC"). The underwriters will be granted a 30-day option to purchase an additional 4,537,500 common shares*. The common shares have been approved for listing on the NASDAQ Global Select Market and subject to official notice of issuance will trade under the symbol "LNCO".

Barclays, Citigroup, RBC Capital Markets, Wells Fargo Securities, BofA Merrill Lynch, Credit Suisse, Raymond James and UBS Investment Bank will act as the joint book-running managers in the transaction. Goldman, Sachs & Co., and J.P. Morgan, will act as senior co-managers in the transaction. Baird, BMO Capital Markets, Credit Agricole CIB, CIBC, Scotiabank / Howard Weil and Mitsubishi UFJ Securities will act as the co-managers in the transaction.

53.    On October 10, 2012, LINN and LNCO filed Amendment No. 5 to the Form S-1/A Registration Statement.  The finalized form S-1/A Registration Statement, which would later be used for the IPO, incorporated a Prospectus to be used in connection with the offer and sale of LNCO shares, as well as the offer and sale of LINN units to be acquired by LNCO with the proceeds of the IPO.

54.    On October 11, 2012 LINN announced the pricing of the LNCO Initial Public Offering.  The press release stated that the shares would trade at $36.50 per common share.

55.    On October 12, 2012 the Prospectus was filed under Rule 424 (b)(1).

56.    On October 25, 2012, LNCO and LINN issued a press release announcing their Third-Quarter 2012 financial and operating results.  In regards to the LNCO IPO, the relevant information following was stated:

On October 11, 2012, LinnCo, LLC (Nasdaq:LNCO), priced *its initial public offering of 34,787,500 common shares, including the over-allotment, at $36.50 per share. LinnCo used the net proceeds of approximately $1.2 billion from the offering, which closed on October 17, 2012, to purchase as equivalent number of LINN units. LINN used those net proceeds to repay indebtedness outstanding under its revolving credit facility*. LinnCo is a limited liability company, the sole voting share of which is owned by LINN, created to enhance LINN's ability to raise additional equity capital to execute on its acquisition and growth strategy. LinnCo's sole purpose is to own LINN units. LinnCo has elected to be treated as a corporation for federal income tax purposes; accordingly investors in LinnCo will receive a quarterly cash dividend and a Form 1099 instead of a Schedule K-1.

57.     The Offering Documents contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

58.     The Offering Documents indicated that the yield on LINN units would be high; thus LNCO would be a valuable stock – as LNCO's success it tied to LINN's capacity to continue paying substantial and increasing distributions to unitholders.  Statements included the following:

> We currently estimate that for each of the periods ending December 31, 2012, 2013, 2014 and 2015, LinnCo's income tax liability will be between 2% and 5% of the cash LINN distributes to us. ***Accordingly, if LINN were to maintain its current annualized distribution of $2.90 per unit through 2015, the annual LinnCo dividend would be between $2.75 and $2.84 per share. For example, we currently estimate that, for the period ending December 31, 2013, our dividend will be $2.84 per share on an annualized basis***."

59.     Regarding the use of the proceeds the Company received from the Stock Offering, the Prospectus stated the following:

> We will use all of the net proceeds from this offering of approximately $1.054 billion ($1.213 billion if the underwriters exercise their option to purchase additional shares in full), after deducting underwriting discounts and the structuring fee, to purchase from LINN a number of LINN units equal to the number of shares sold in this offering. LINN will pay the expenses of this offering.

> LINN will use the proceeds it receives from the sale of LINN units to repay debt outstanding under its revolving credit facility and pay the estimated expenses of this offering.

> Affiliates of certain of the underwriters in this offering are lenders under LINN's revolving credit facility and, accordingly, will indirectly receive a portion of the net proceeds from this offering.

60.     Regarding LNCO's dividend policy, the Prospectus stated the following:

Our limited liability company agreement requires us to pay dividends on our shares of the cash we receive as distributions in respect of our LINN units, net of reserves for income taxes payable by us, within five business days after we receive such distributions.

61.     LINN uses non-GAAP financial measures in its hedging strategies.  Specifically, as stated in the Offering Documents, LINN uses adjusted EBITDA, which is defined as the following:

LINN defines adjusted EBITDA as net income (loss) plus the following adjustments:

• Net operating cash flow from acquisitions and divestitures, effective date through closing date;
• Interest expense;
• Depreciation, depletion and amortization;
• Impairment of long-lived assets;
• Write-off of deferred financing fees;
• (Gains) losses on sale of assets and other, net;
• Provision for legal matters;
• Loss on extinguishment of debt;
• Unrealized (gains) losses on commodity derivatives;
• Unrealized (gains) losses on interest rate derivatives;
• Realized (gains) losses on interest rate derivatives;
• Realized (gains) losses on canceled derivatives;
• Realized gain on recovery of bankruptcy claim;
• Unit-based compensation expenses;
• Exploration costs;
• Income tax (benefit) expense; and
• Discontinued operations.

Adjusted EBITDA is a measure used by LINN's management to indicate (prior to the establishment of any reserves by the board of directors) the cash distributions LINN expects to make to its unitholders. Adjusted EBITDA is also a quantitative measure used throughout the investment community with respect to publicly traded partnerships and limited liability companies.

62.     Additionally, the Offering Documents presented a reconciliation of net income (loss) to adjusted EBITDA (unaudited):

| | Year Ended December 31, | | | Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2011** | **2012** |
| | | | (in thousands) | | |
| Net income (loss) | $(298,192) | $(114,288) | $ 438,439 | $(209,573) | $ 230,884 |
| Plus: | | | | | |
| Net operating cash flow from acquisitions and divestitures, effective date through closing date | 3,708 | 42,846 | 57,966 | 36,359 | 45,127 |
| Interest expense, cash | 74,185 | 129,691 | 249,085 | 125,181 | 129,652 |
| Interest expense, noncash | 18,516 | 63,819 | 10,640 | 644 | 42,257 |
| Depreciation, depletion and amortization | 201,782 | 238,532 | 334,084 | 145,711 | 260,782 |
| Impairment of long-lived assets | — | 38,600 | — | — | 146,499 |
| Write-off of deferred financing fees | 204 | 2,076 | 1,189 | 1,189 | 7,889 |
| (Gains) losses on sale of assets and other, net | (23,051) | 3,008 | 124 | (916) | 991 |
| Provision for legal matters | — | 4,362 | 1,086 | 740 | 795 |
| Loss on extinguishment of debt | — | — | 94,612 | 94,372 | — |
| Unrealized (gains) losses on commodity derivatives | 591,379 | 232,376 | (192,951) | 261,851 | (250,406) |
| Unrealized (gains) losses on interest rate derivatives | (16,588) | (63,978) | — | — | — |
| Realized losses on interest rate derivatives | 42,881 | 8,021 | — | — | — |
| Realized (gains) losses on canceled derivatives | (48,977) | 123,865 | (26,752) | — | — |
| Realized gain on recovery of bankruptcy claim | — | — | — | — | (18,277) |
| Unit-based compensation expenses | 15,089 | 13,792 | 22,243 | 11,181 | 14,834 |
| Exploration costs | 7,169 | 5,168 | 2,390 | 995 | 817 |
| Income tax (benefit) expense | (4,221) | 4,241 | 5,466 | 5,868 | 9,430 |
| Discontinued operations | 2,351 | — | — | — | — |
| Adjusted EBITDA | $ 566,235 | $ 732,131 | $ 997,621 | $ 473,602 | $ 621,274 |

63.     Furthermore, LINN used adjusted EBITDA, non-GAAP measures to represent to investors what was needed to cover distributions.  The ability to pay distributions was stated as being represented by:

LINN's cash flow (defined as Adjusted EBITDA less interest expense) compared to its budget for 2011; and

LINN's Distribution Coverage Ratio as compared to its budget. Distribution coverage ratio is defined as Distributable Cash Flow for 2011 divided by total cash distributions. Distributable Cash Flow is defined as Adjusted EBITDA (defined below) less cash interest expense and maintenance capital.

15

64.     The Offering Documents estimated that the Distribution Coverage Ratio was 1.25x, meaning that the Distribution Coverage Ratio is more than adequate to cover the distribution, or it is 25% more than what is needed:

| | Revised Budget Target* | Revised Budget Range* | 2011 Estimated Performance as of January 2012 [1] |
|---|---|---|---|
| **Operations** | | | |
| Volumes (MMcfe/day) | 393 | 364-422 | 369 |
| Cash Costs (Lease Operating Expenses and General and Administrative Expenses) (in millions) | $  317 | $   301-333 | $        343 |
| Cash Costs (Lease Operating Expenses and General and Administrative Expenses) ($/Mcfe) | $ 2.21 | $ 2.32-2.10 | $       2.52 |
| **Ability to Pay Distributions** | | | |
| Cash Flow (Adjusted EBITDA less Interest Expense) (in millions) | $  745 | $   690-800 | $        758 |
| Cash Flow/Unit (Cash flow divided by units outstanding) | $ 4.01 | $ 3.71-4.31 | $       4.36 |
| Distribution Coverage Ratio | 1.22x | 1.10-1.34x | 1.25x |

65.     The Offering Documents, and the documents incorporated by reference therein, contained material misstatements and omissions regarding the Company's business and operations.  Specifically, the Offering Documents fail to include material adverse information concerning, among other things, the Company's accounting, financial condition and business prospects.

66.     The statements in the Offering Documents, and in filings which were incorporated by reference in the Offering Documents, were materially false and/or failed to disclose: (1) LNCO's presentation of adjusted EBITDA, Distribution Coverage Ratio and Distributable Cash Flow were not accurate or reliable metrics for estimating LINN's ability to make distributions because the metrics did not properly reflect the cost of financial derivatives actually paid by LINN; (2) that the Company's statements regarding its business and operations were materially

false and misleading, and lacked reasonable basis when made; and (3) that as a result the

Offering Documents overstated LNCO's ability to pay distributions and misled investors about

the risk of their LNCO investments.

C.       **The Truth Comes to Light**

67.       On February 16, 2013, *Barron's* published an article[1] entitled "Drilling Into the

Numbers," raising questions about LINN's hedging strategy.   The article stated the following in

relevant part:

> Linn (ticker: LINE) hedges all of its oil and natural-gas output with financial
> derivatives, the better to provide a steadily growing level of income to unit
> holders. The company pays an annualized distribution—the MLP equivalent of a
> dividend—of $2.90 per unit, which equates to a yield of 8%, based on its current
> share price of $36.
>
> ***That yield has attracted investors, but they could be overpaying. Linn's units***
> ***trade for 10 times 2012 pretax cash flow***, roughly double the valuation of energy
> exploration and production companies such as Apache (APA), Devon Energy
> (DVN), and Canada's Suncor Energy (SU), and in excess of valuations accorded
> smaller energy producers structured as MLPs.
>
> ***Moreover, Linn may be overstating the cash flow available for distribution, by***
> ***not deducting the cost of financial derivatives—mainly put options—from its***
> ***realized gains on hedging activities in its quarterly results***. Bears argue that
> funds invested in derivatives should be treated as an expense, and at least one of
> Linn's major competitors follows that approach. Linn says its energy derivatives
> are an integral part of its corporate strategy and amount to an asset, much like an
> oil and gas property. The value of such assets typically gets depreciated over their
> useful life.
>
> ***                                            
>
> Wall Street analysts have ignored the derivatives issue until now. Thirteen of the
> 18 analysts who follow the company rate it Buy, and bulls note that Linn's energy
> production, including oil, gas, and natural-gas liquids, more than doubled in last
> year's third quarter, to the equivalent of 782 million cubic feet per day.
>
> But David Amoss, an analyst at Howard Weil, broke ranks on Friday and
> downgraded Linn to Sector Perform from Outperform, citing the company's

---

[1] Andrew Bary, *Drilling Into the Numbers*, BARRON'S, Feb. 16, 2013, *available at*:
http://online.barrons.com/article/SB50001424052748704852604578298253512225108.html#articleTabs_article%3
D2

treatment of its hedging costs. *Amoss cut his estimate of 2013 distributable cash flow to $2.45 per unit from $3.03, "to better reflect the underlying cost of the hedges" that he estimates at $120 million annually, he wrote in a client note.* Linn might have to make accretive acquisitions this year to cover its $2.90 distribution, he added. Alternately, it is possible the distribution could be cut. Linn shares fell 3.8% on Friday, but still trade for two times book value.

Linn has projected distributable cash flow of $684 million, or $3.31 a share, for 2012. It is due to report fourth-quarter results on Thursday.

Hedging gains contribute a sizable percentage of Linn's distributable cash flow. The company spent $583 million on derivatives purchases in the first nine months of 2012, and hedging gains in that period totaled $281 million, or 55% of distributable cash flow of $503 million. The company's financial reports don't break out the derivatives costs that are included in gains, but Linn's history of derivatives purchases suggests annual costs of $100 million to $150 million. Amoss' $120 million estimate is squarely in that range.

Linn expenses the cost of puts and other derivatives over a multiyear period when calculating net income, as mandated by accounting rules. But it doesn't deduct such costs from distributable cash flow, a financial measure that isn't compiled in accordance with GAAP, or generally accepted accounting principles. This means companies have leeway in making the latter calculations. Usually, they subtract interest expense and maintenance capital expenditures from gross cash flow to derive the amount of cash available to be distributed to holders.

While net income is the most common financial yardstick for corporations, it can be of little use in evaluating MLPs, particularly partnerships like Linn that make heavy use of derivatives for hedging. Quarterly changes in the value of a multiyear hedge portfolios can overwhelm and distort operating results.

Linn reported a net loss of $430 million in the third quarter, for instance. But it determined that distributable cash flow totalled $202 million. The discrepancy was caused primarily by $520 million of unrealized losses in its derivatives book, which occurred in a quarter when energy prices rose.

LINN'S DERIVATIVES PORTFOLIO has insulated the company from a weak natural-gas market, and allowed it to pay a steadily rising distribution. In the third quarter, it received a price of $2.71 per thousand cubic feet for its natural gas, but realized more than $5 per Mcf after accounting for hedging gains.

MLPs and other energy companies can use swaps or purchase put options to lock in future oil and gas prices. (Puts give the holder the right to sell a security or commodity at a fixed price by a predetermined date.) Some companies prefer swaps to puts because puts are more expensive. Most swaps are executed "at the

money," meaning they are based on future oil and gas prices implied in the futures market. The advantage of a put is that the holder gets upside above the put price.

It appears from Linn's financial statements that the company bought a considerable amount of in-the-money put options on natural gas last year. These are more expensive than at-the-money puts. Specifically, Linn bought a lot of puts struck at $5 per Mcf from 2013 through 2017 at a time when the "strip" (the average price for that five-year period) was in the $4 to $4.50 range. The puts would have had an intrinsic value of 50 cents or more. Gas now trades around $3.15 per Mcf, after averaging $3 in 2012, making the puts more valuable still.

The likelihood of such gains explains why Linn spent almost $600 million on derivatives purchases in the nine months ended in September, up from just $134 million in all of 2011. Given Linn's accounting for derivatives, the put purchase prices eventually should be reflected as a hedging gain in cash flow. Linn says last year's hefty derivatives purchases reflected sizable acquisitions. It spent $2.8 billion on energy deals in 2012.

LINN CONTENDS THAT ITS "cost of capital" is one of its main advantages over rival energy producers. Essentially, that means it has a more richly valued stock, which has helped it outbid other companies for oil and gas assets, which in turn have been accretive to cash flow. The company relies on equity offerings and debt to fund acquisitions. A lower share price would hinder its acquisition strategy, and thus, the growth of distributable cash. Linn has ample debt of $5.5 billion, resulting in a junk-grade credit rating from both Moody's and Standard & Poor's.

Given that 5% dividends are available from fortress-like energy companies such as Royal Dutch Shell (RDS/A), investors might want to steer clear of riskier bets like Linn. At the very least, Wall Street should start asking harder questions about what Linn calls its "industry-leading hedge program."

68.     On February 21, 2013, LINN and LNCO announced their financial and operating results for the fourth quarter and the year-ended December 31, 2012, as well as the outlook for 2013. In addition, LINN and LNCO announced the signing of a definitive merger agreement to acquire all of Berry Petroleum Company's ("Berry") outstanding shares for $4.3 billion, including the assumption of debt. LNCO agreed to issue 1.25 common shares for each common share of Berry outstanding prior to the merger.

69.     *Barron's* continued to expose the truth behind LINN's practices.  In a May 4, 2013 article[2] entitled "Twilight of a Stock-Market Darling" stated that LINN "may be the country's most overpriced large energy producer" and LINN "has for years used aggressive accounting to prettify its financial statements."  The article stated in relevant part, the following:

> ***Linn Energy may be the country's most overpriced large energy producer. The controversial domestic oil-and-gas company, which is structured as a publicly traded partnership, has for years used aggressive accounting to prettify its financial statements, and serial acquisitions to shore up its reserves.*** Signs now suggest that those strategies, which are legal, may no longer be working.

> ***The firm's partnership units, which trade at $38.50, may be worth less than half of their current quote, based on a range of financial measures, including book value, cash flow, and the value of energy reserves.***

> Linn (ticker: LINE), which has a market value of $9.1 billion and $6.2 billion in debt, has so far withstood scrutiny, in part because of its strong base of retail investors, who mistakenly liken Linn to a stable energy-pipeline master limited partnership, rather than the riskier energy producer that it is. Linn is by far the largest energy producer structured as a partnership.

> Many investors look no further than the company's large and growing distribution as a sign of health. Linn yields 7.5%. ***In the first quarter, however, it failed to produce enough cash to cover its distribution, even by its generous measure of distributable cash flow. Should the company ever cut its payout, its units could plunge.***

> Houston-based Linn calls itself "a different kind of oil-and-natural-gas company." It buys oil and gas properties in the continental U.S. and hedges most of the energy output for several years to lock in revenues. Last year, it laid out $2.6 billion to acquire energy assets. Its largest deal, an all-stock, $4.3 billion purchase of Berry Petroleum (BRY), a Denver-based energy outfit, is due to close on about July 1.

> Linn expects to boost its quarterly distribution to 77 cents from 72.5 cents after the Berry deal closes. Without Berry, the company projects that it would generate barely enough distributable cash flow in 2013 to cover its current annualized payout of $2.90 per unit. In this year's first quarter, Linn reported just 64 cents a unit in distributable cash flow.

---

[2] Andrew Bary, *Twilight of a Stock Market Darling*, BARRON'S, May 4, 2013, *available at*: http://online.barrons.com/article/SB50001424052748703591404578456911269145042.html#articleTabs_article%3D1

In a statement, Linn said it looks at distribution coverage "on an annual basis, rather than quarter to quarter."

**Linn's distributable cash flow looks significantly overstated**. For starters, it doesn't reflect the cost of financial derivatives, mainly in-the-money put options on natural gas. That was the subject of a recent, skeptical *Barron's* article ("Drilling Into the Numbers," Feb. 18), when the stock traded at about $36. Since then, Linn has stated that it will stop buying puts, which allow it to sell gas for above-market prices.

**Barron's** *is revisiting Linn because a bigger problem is now apparent. The company's energy production has flattened, despite heavy capital expenditures. The first-quarter financial report released on April 25 showed total energy production averaging 796 million cubic feet per day, with oil and other liquids production converted to an energy equivalent amount of natural gas. That was down from 800 million cubic feet a day in 2012's fourth quarter and little changed from the 782 million cubic feet in last year's third quarter.*

The first-quarter production was below prior Linn guidance of about 827 million cubic feet per day. It attributed the shortfall mainly to a series of one-time events, including bad weather. Linn, however, expects little change in second-quarter energy output. And the company looks for improvement in the second half of 2013.

***

During the first quarter, Linn had Ebitda of $356 million and calculated distributable cash flow of $151 million. That's after deducting $95 million of cash interest expense and $110 million of maintenance capital. Linn's total capital expenditures were about $260 million in the period. The difference between total capital expenditures and maintenance capital costs—$150 million—is what Linn calls growth capital expenditures.

Bears argue that this distinction is meaningless because Linn failed to expand production in the first quarter, relative to the total in 2012's fourth quarter. "It doesn't make any sense," says Kevin Kaiser, an analyst at Hedgeye Risk Management, a Connecticut independent research firm. ***"Linn can't keep production flat despite $260 million of capital expenditures. Yet the amount of capital spending that is deducted from their definition of distributable cash flow was only $110 million."***

Linn says "results from maintenance capital spending are not always evident in the quarter in which the capital was spent."

Kaiser estimates that Linn actually had negative free cash flow of about $40 million in the quarter, after deducting total capital expenditures and making other

21

adjustments. He says this raises questions about the quality of its energy assets. "When Linn doesn't get growth through acquisitions, it gets ugly," he says.

Then there is the put issue. Linn last year spent $583 million on derivatives, largely in-the-money puts on natural gas struck at $5 per thousand cubic feet maturing in 2013 through 2016. This occurred when gas traded below $4 per MCF. Gas is now about $4.10. The company's energy output is more than half gas, with the rest natural-gas liquids and oil.

As a result of derivatives, Linn realized more than $5 per MCF for its gas during the first quarter, when the market price was about $3.50. While the put expense is properly reflected in Linn's GAAP financials, Linn excludes it from distributable cash flow. "Linn views puts as a 'capital' cost and considers the premiums it pays for derivatives as part of the investment in its business," the company stated in a presentation last month.

***

Linn "recognizes the full proceeds of hedging transactions upon maturity and while recognizing none of the initial costs," Green Owl wrote in a report earlier this year, noting that the accounting implies that Linn "buys puts for free." The firm, which was short Linn at the time of the report, studied more than 30 energy companies and found none employing Linn's put strategy.

It would be like a money manager buying a put on Microsoft struck at $40, selling the stock at $40 and then ignoring the cost of the option, which would be about $7, based on Microsoft's recent price of $33.

What's the put impact on Linn? It's tough to say precisely because the company refuses to disclose it. Hedgeye assumes about $120 million, or about 50 cents per unit, in annual costs that aren't reflected in distributable cash flow, which totaled $679 million last year. With more realistic derivatives accounting, Linn wouldn't have covered its distribution last year.

70.     As a result of the May 4, 2013 *Barron's* article, LINN units declined 7%, from

$38.44 the previous trading session to close at $35.75 per unit on May 6, 2013.  In turn, LNCO

shares dropped approximately 8%, from $42.56 the previous trading session to close at $39.24

per share on May 6, 2013.

71.     On June 4, 2013, LNCO and LINN filed a Form S-4 Registration Statement in connection with the proposed Barry Petroleum acquisition.  The S-4 statement defined "Mark-to-market (gains) losses on commodity derivatives as the following":

> Represent changes in fair value of the derivative contracts from period to period and include the premiums associated with put option contracts over time. LINN considers the cost of premiums paid for put options as an investment related to its underlying oil and natural gas properties only for the purpose of calculating the non-GAAP measures of adjusted EBITDA and DCF. The premiums paid for put options that settled during the three months ended March 31, 2013 and March 31, 2012 and during the years ended December 31, 2012, 2011 and 2010 were approximately $43 million, $26 million, $148 million, $88 million and $94 million, respectively.

72.     On June 15, 2013, *Barron's* published a third article[3], entitled "Linn Comes Clean on Derivative Costs."  The article stated that "[a] surprise disclosure from Linn Energy (ticker: LINE), buried in a recent regulatory filing related to its planned merger with Berry Petroleum (BRY), supports the view put forth in *Barron's* that the oil and natural-gas producer's distributable cash flow is overstated and doesn't cover its distributions to investors."  The article stated the following in relevant part:

> A surprise disclosure from Linn Energy (ticker: LINE), buried in a recent regulatory filing related to its planned merger with Berry Petroleum (BRY), supports the view put forth in *Barron's* that the oil and natural-gas producer's distributable cash flow is overstated and doesn't cover its distributions to investors.
>
> ***One of the key controversies surrounding Linn, which is structured like a master limited partnership, is the accounting for its energy derivatives in its distributable cash flow, a key financial measure for MLPs. Distributable cash flow (DCF) is the basis for Linn's distribution, the MLP equivalent of a dividend. Linn has a market value of $7.5 billion, plus $6 billion of debt.***
>
> Linn has realized above-market prices for its natural gas due to its use of derivatives, including in-the-money put options. This has allowed the company to

---

[3] Andrew Bary, *Linn Comes Clean on Derivative Costs,* BARRON'S, June 15, 2013, *available at*: http://online.barrons.com/article/SB50001424052748704878904578541271968688436.html#articleTabs_article%3D2

get more than $5 per million British thermal units for its gas when the market price has been $4 or lower.

Linn argues that the put options amount to a capital investment, so their cost shouldn't be deducted from distributable cash flow. The company has leeway in computing DCF because the measure isn't governed by generally accepted accounting principles.

*Barron's* view is that Linn's accounting is aggressive, because the company wants to recognize the financial benefits of the puts, but not the costs ("Twilight of a Stock Market Darling," May 6). In its GAAP-compliant net income, it recognizes its derivative expense.

"It's the gain or loss from the derivative transaction that must be reflected in pretax accounting income, not merely the proceeds derived from the sale or disposition of the derivative," says New York tax expert Robert Willens. "I can't think of an accounting principle or theory that would permit recording only the proceeds from the derivative while ignoring the cost."

***Accounting issues, plus a flattening in Linn's energy output and concerns that Linn's merger with Berry may get derailed, all have weighed on Linn units.*** They fell 8% last week to $31, down from $38 at the time of our May article. Based in part on analysis from Hedgeye Risk Management, an independent research firm, we argued that Linn units are worth no more than book value, or about $17 per unit. Support for Linn units comes from a 9% yield.

The Berry deal, which needs shareholder approval, is expected to close in the third quarter, later than originally forecast.

***Until the recent disclosure in a footnote on page 257 of a revised proxy for the deal, it wasn't possible to calculate the impact of the puts on Linn's distributable cash. And contrary to the impression the company has given this year in presentations aimed at thwarting short-sellers, that expense is significant. During the first quarter, the cost of puts that settled in that period was $43 million, or nearly 30% of the company's reported distributable cash flow of $150 million.***

***Linn didn't cover its first-quarter distribution of 72.5 cents per unit even before factoring in the put cost. Including the put cost, the coverage ratio was just 63%. Some investors have said Linn is covering its distribution by selling equity and debt***. The company disputes this, maintaining the funds come from free cash flow. Linn says it expects to fully cover its distribution for the full year.

The drop in Linn units could imperil the Berry deal. Linn will pay for Berry with shares of LinnCo (LNCO), a corporation created by Linn that holds Linn units. LinnCo trades at $37, a six-point premium to Linn, but there is reason to believe

the price of the less-liquid LinnCo shares will converge with the price of the Linn units, making the deal unattractive to Berry holders. LinnCo's current premium could reflect the difficulty of shorting the stock.

What's more, there could be adverse tax consequences from the Berry deal for LinnCo holders, starting in 2016. Hedgeye's Kevin Kaiser argues that LinnCo shares probably should trade at a discount to Linn units because of the tax liability. Linn cites an opinion from an independent financial advisor that found the Berry deal fair to LinnCo holders, "including the deferred tax liability."

***Berry investors might want to think hard about approving the Linn merger, considering Linn's aggressive accounting and the potential tax hit. Linn units may be headed lower, and that could happen quickly if the Berry deal, considered important to Linn's financial outlook, collapses***.

73.     On July 1, 2013, LINN and LNCO announced an informal Securities and Exchange Commission ("SEC") inquiry regarding LINN and LNCO.  The SEC "requested the preservation of documents and communications that are potentially relevant to, among other things, LinnCo's proposed merger with Berry Petroleum Company, and LINN and LinnCo's use of non-GAAP financial measures and hedging strategy."

74.     On the news of the SEC inquiry, LNCO shares plummeted from a closing of $37.07 per share on July 1, 2013 to a closing of $26.95 per share on July 3, 2013, for a sharp decrease of approximately 27%.

## V.     COUNTS AGAINST DEFENDANTS UNDER THE SECURITIES ACT

### COUNT I
### FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT
### AGAINST ALL DEFENDANTS

75.     Plaintiff incorporates the allegations contained above pertaining to the false Offering Documents.  For purposes of Counts I and II, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as these counts are based solely on claims of strict liability and/or negligence under the Securities Act.

76.     This Count is brought against Defendants on behalf of all persons or entities who purchased LNCO stocks issued pursuant to or traceable to the October 12, 2012 Stock Offering. The Offering Documents for the Stock Offering were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts, as described above.

77.     Defendants are strictly liable for the above-noted misstatements and omissions, and for the damages that Plaintiff and the other members of the Class have sustained thereby. Defendants are responsible for the content and dissemination of the Offering Documents, and did not conduct a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Offering Documents were true, without the omissions of any material facts, and were not misleading.

78.     Defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public that were contained in the Offering Documents, which misrepresented or failed to disclose, among other things, the facts set forth above.  By reasons of the conduct herein alleged, each Section 11 Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

79.     Plaintiff and the Class have sustained damages.  The value of LNCO shares have declined substantially from the price at which they were purchased.

80.     At the time of their purchases of LNCO shares, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based, to the time that Plaintiff filed this

complaint.  Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public, and the time Plaintiff filed this Complaint.

## COUNT II
### FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT AGAINST THE OFFICER DEFENDANTS

81.     Plaintiff incorporates the allegations contained above pertaining to the false Offering Documents.  For purposes of Counts I and II, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as these counts are based solely on claims of strict liability and/or negligence under the Securities Act.

82.     This Count is brought against the Officer Defendants, each of whom was a controlling person of LNCO by virtue of their position as directors and/or senior officers of LNCO and/or by virtue of their status as a major shareholder of the Company.

83.     This Claim is brought against the Officer Defendants pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of all persons or entities who purchased LNCO securities issued pursuant to or traceable to the November 4, 2011 Stock Offering.

84.     The Company is liable under Section 11 of the Securities Act as set forth in Count I herein with respect to the Stock Offering.

85.     Each of the Officer Defendants was a control person of the Company with respect to the Stock Offering by virtue of that individual's position as a senior executive officer and/or director of the Company.  These Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of LNCO.  By reason of their positions within the Company, and/or their securities ownership, and/or because of their positions on LNCO's Board of Directors, the Officer Defendants had the

requisite power to directly or indirectly control or influence the specific corporate policy that resulted in the unlawful acts and conduct alleged in Count I.

86.     Each of the Officer Defendants was a culpable participant in the violations of Section 11 of the Securities Act alleged in Count I above, based on their having signed the Offering Documents and the filings incorporated by reference therein, and having otherwise participated in the process that allowed the Stock Offering to be successfully completed. These Defendants, by virtue of their managerial and/or Board positions with the Company, controlled the Company, as well as the contents of the Offering Documents at the time of the Stock Offering. Each of the Officer Defendants was provided with or had unlimited access to copies of the Offering Documents, and had the ability to either prevent their issuance or cause them to be corrected.

87.     Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based, to the time that Plaintiff filed this complaint. Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public, and the time Plaintiff filed this Complaint.

88.     As a result, the Officer Defendants are liable under Section 15 of the Securities Act for the Company's primary violation of Section 11 of the Securities Act.

89.     By virtue of the foregoing, Plaintiff and the other members of the Class who purchased or otherwise acquired the Company's securities pursuant to and/or traceable to the Stock Offering are entitled to damages against the Officer Defendants.

## VI.   <u>CLASS ACTION ALLEGATIONS</u>

90.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired LNCO securities pursuant to the IPO during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of LNCO and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

91.   The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the Class located throughout the United States.  Throughout the Class Period, LNCO securities were actively traded on the NASDAQ (an open and efficient market) under the symbol "LNCO."  As of March 31, 2013, LNCO had 34,787,500 common shares outstanding.  Record owners and the other members of the Class may be identified from records maintained by LNCO and/or its transfer agents, and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in other securities class actions.

92.   Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

93.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff had no interest antagonistic or in conflict with those of the Class.

94.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.     whether Defendants participated in and pursued the common course of conduct complained of herein;

c.     whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period, including the Offering Documents, misrepresented material facts about the business, finances, financial condition and prospects of LNCO;

d.     whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of LNCO;

e.     whether the market price of LNCO common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.     the extent to which the members of the Class have sustained damages and the proper measure of damages.

95.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a)    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)    Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c)    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)    Awarding such other relief as this Court deems appropriate.

## VIII.    DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 23, 2013

LAW OFFICES OF CURTIS V. TRINKO, LLP

By: _Curtis V. Trinko_

Curtis V. Trinko (CT-1838)
Jennifer E. Traystman
C. William Margrabe
16 West 46th Street, 7th Floor
New York, NY 10036
Tel:  (212) 490-9550

31

Fax:  (212) 986-0158
Email:  Ctrinko@trinko.com

*Liaison Counsel for Plaintiff*

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White, III (JW-9598)
Lester R. Hooker
Brandon T. Grzandziel
2424 North Federal Highway
Suite 257
Boca Raton, FL 33431
Tel:  (561) 394-3399
Fax:  (561) 394-3382

*Counsel for Plaintiff*

## Certification and Authorization of Lead Plaintiff

I, Kevin Feldman, certify that:

1. I have reviewed a complaint in this action and have selected Saxena White P.A. as my counsel.

2. I did not acquire the security that is the subject of this action at the direction of counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. I represent and warrant that I am fully authorized to enter into and execute this certification.

5. I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. I have made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 05/07/13 | 1,000 | $39.51 |
| Purchase | 05/07/13 | 1,000 | $39.46 |
| Purchase | 05/17/13 | 1,000 | $37.85 |
| Sale | 06/25/13 | 1,000 | $37.54 |

7. During the three years prior to the date of this Certification, I have not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except if detailed below:

    *Solvibile v. Atlantic Power Corporation et al.,* Case No. 13-cv-10537-DPW (D. Mass.)

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate.

Dated: July 22, 2013

Kevin Feldman